# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00474-CV

Susan Combs, Comptroller of Public Accounts of the State of Texas, Appellant

v.

Entertainment Publications, Inc., Appellee

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT
### NO. D-1-GN-08-002240, HONORABLE GUS J. STRAUSS JR., JUDGE PRESIDING

## O P I N I O N

Appellee Entertainment Publications, Inc. ("Entertainment") sued Susan Combs, Comptroller of Public Accounts of the State of Texas (the "Comptroller"), for declaratory and injunctive relief to prevent the Comptroller from implementing a new rule that would require Entertainment to collect and remit tax on the sales of products sold through school fundraising activities. The trial court denied the Comptroller's plea to the jurisdiction and granted a temporary injunction in favor of Entertainment, enjoining the Comptroller from implementing and enforcing a new rule governing the tax treatment of fundraising sales. In this interlocutory appeal, the Comptroller complains of the denial of her plea to the jurisdiction, *see* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West 2008), and the grant of the temporary injunction, *see id.* § 51.014(a)(4). The Comptroller argues that the policy statement Entertainment complains of is not a "rule" that may be challenged under the Administrative Procedures Act ("APA"), *see* Tex. Gov't Code Ann. §§ 2001.021-.041 (West 2008); that the court lacked jurisdiction to grant declaratory relief under

the Uniform Declaratory Judgments Act ("UDJA"), *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008); and that injunctive relief is improper. We will affirm the orders of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Entertainment is a brochure-fundraising firm that contracts with schools and related organizations, some tax-exempt, to sell merchandise and food products in order to raise funds for student groups. The fundraising products are sold by the school groups to third-party consumers using Entertainment's brochures and order forms at retail prices suggested by Entertainment in its catalogs. According to Entertainment, its initial sales to the school groups are separate transactions from the ultimate sales of items by the school groups to the end consumers. In Entertainment's view, this "two-sale transaction" system dictates that the school groups themselves are the actual "sellers" of goods for the following reasons:

> The school [group] purchases sales inventory from a vendor [such as Entertainment] for a certain price (first transaction) and then resells the taxable items at its own profit or loss for a price the organization determines (second transaction).
>
> The school [group] assumes the responsibility and risk.
>
> The school [group] does not receive a commission on sales, nor does it share or split the proceeds with the vendor in any way.

Thus, Entertainment argues that the school groups, not Entertainment, are the "sellers" and therefore are responsible for collecting and remitting any sales tax due on the items sold to the end consumers. *See* Tex. Tax Code Ann. § 151.052(a)-(b) (West 2008) (requiring that "seller"

2

of taxable item collect sales tax). Furthermore, when the school groups claim an intention to resell the fundraising products, Entertainment maintains that, based on the "sale for resale" exemption in section 151.302 of the tax code, it is not responsible for collecting sales tax on its initial sales to the school groups. *See id.* § 151.302(a) (providing that "sale for resale" of taxable item is exempted from sales tax); *see also id.* § 151.006(a)(1) (defining "sale for resale" of tangible personal property). Accordingly, Entertainment asserts that it accepts resale or exemption certificates in lieu of charging sales tax to schools that claim an intention to resell the fundraising products. Only when schools do not provide a resale or exemption certificate does Entertainment charge sales tax, based on the "wholesale" price that schools pay Entertainment for the products.

In marketing itself to school groups, Entertainment relies on a further exemption in the tax code, which provides that a tax-exempt organization such as a school may hold two one-day, tax-free sales per year, at which the sale of an item priced $5,000 or less is exempted from sales tax. *See id.* § 151.310; 34 Tex. Admin. Code § 3.322(h)(2) (2008). Such sales are permissible, however, only if the school—not Entertainment—is regarded as the actual "seller" of the fundraising products. According to Entertainment, its business model "allows schools to utilize the tax advantages of the two-sale scenario" because the schools can resell the fundraising products without having to calculate the sales tax due on the items or collect sales tax from the end consumers.

The alternative to viewing these types of transactions as two distinct sales is to characterize them as a single sale, wherein the fundraising firm is the seller and the school or school group acts as the seller's agent. In these circumstances, the fundraising firm bears the responsibility

3

of collecting and remitting sales tax on the products, which may not be sold tax-free during one of the school's tax-free sales days.

Entertainment asserts that it developed its understanding that the transactions at issue were two distinct sales from what it refers to as the Comptroller's "long-standing rule" stated in a 2007 letter ruling identified as Accession No. 200704926L. The so-called Factual Criteria Rule, as described in that letter,[1] provided the following guidelines for determining whether the fundraising firm or the school organization was the "seller" for purposes of collecting sales tax:

> The PTA is the seller when it purchases sales inventory from a vendor for a certain price (first transaction) and then resells the taxable items at its own profit or loss for a price the PTA determines (second transaction). The PTA assumes all responsibility and risk.
>
> The PTA is the seller when it does not share/split the proceeds with the vendor/distributor.
>
> . . . .
>
> The PTA is not the seller when it takes orders for the vendor and receives a commission from the vendor, such as a share or split of the proceeds. This is true regardless of who is setting the sales price.
>
> . . . .

---

[1] The inquiry to which Accession No. 200704926L responded was submitted by an unidentified vendor seeking clarification of the same issues involved in this appeal. The vendor specifically asked about sales to parent-teacher organizations, and thus the Comptroller's response refers only to "PTAs." (All of the Comptroller's accessions are available through http://cpastar2.cpa.state.tx.us.)

> Whether the payment, such as a check, is made to the PTA or the vendor may not be an indicator of the seller. For example, a check could be made to the PTA, but if the PTA is receiving a commission from a vendor, the PTA is not the seller.[2]

According to the testimony of the Comptroller's representative, this letter accurately stated, at that time, the Comptroller's policy as to brochure fundraising.

On March 18, 2008, the Comptroller sent a letter to the Executive Director of the Association of Fundraising Distributors and Suppliers (the "March 2008 letter"), stating the following:

> The Comptroller's office has consistently held that sales will not qualify as one of a non-profit organization's tax-free sales days when a school group raises funds by acting as sales representatives or agent for a for-profit retailer. In these cases, the retailer is the seller of the goods.

The March 2008 letter, which was signed by the Comptroller, Susan Combs, went on to explain that her office had conducted a review of fundraising firms and found that a number of them had not been following the applicable statutes and guidelines her office had promulgated. The letter stated, "Our office has reviewed the situation and determined that fundraising firms should not be allowed to mischaracterize their relationships with the schools." Specifically, the Comptroller expressed

---

[2] These guidelines are similar to and consistent with the Comptroller's statements in other documents referenced in Accession No. 200704926L. *See, e.g.*, Accession No. 200204940L (Apr. 5, 2002) (noting that in situation when exempt organization is merely acting as sales representative, seller is responsible for collecting and remitting sales tax); Accession No. 9808714L (Aug. 4, 1998) (stating that distributor does not need to collect sales tax if exempt organization is purchasing taxable items for its own use or to sell); Accession No. 8609H0755E02 (Sept. 17, 1986) (applying rule that if school assumes responsibility for activity and/or sales, school is responsible for ensuring tax is paid).

concern that fundraising firms had been modifying their contracts with schools to "include language concerning sellers' responsibilities and recharacterizing commission payments as markup." As a result, "non-profit school groups would be forced to analyze and review each contract with its vendors to determine who is responsible for collecting and remitting sales tax and whether it must expend one of its tax-free sales days for the sales under that contract."

The March 2008 letter further stated that section 151.024 of the tax code had been "applied to direct marketing firms operating in Texas for several years." Section 151.024, entitled "Persons Who May Be Regarded As Retailers," provides:

> If the comptroller determines that it is necessary for the efficient administration of this chapter to regard a salesman, representative, peddler, or canvasser as the agent of a dealer, distributor, supervisor, or employer under whom he operates or from whom he obtains the tangible personal property that he sells, whether or not the sale is made in his own behalf or for the dealer, distributor, supervisor, or employer, the comptroller may so regard the salesman, representative, peddler, or canvasser, and may regard the dealer, distributor, supervisor, or employer as a retailer or seller for purposes of this chapter.

Tax Code § 151.024. The March 2008 letter concluded, "For the efficient administration of the tax and to create certainty for the non-profits that tax would be collected and paid by the fundraising firm and not the school organization, we believe we need to utilize this section of the statute."

According to the Comptroller's witness, the effect of "utilizing" section 151.024 was to do away with the fundraising firm's ability "to contractually change the responsibilities of the buyer and the seller. We—the Comptroller just determined that the [fundraising firm] would be the seller regardless of these factors [listed in Accession No. 200704926L]." On cross-examination, the Comptroller's representative further testified:

6

Q. But under what we call the old rule, you went through these factors and you could make a determination whether the school was the seller or the school was the agent.

A. That is correct.

Q. Okay. And then, in March, the Comptroller invoked 151.024 and said, "We're not going to do this analysis anymore. If you're a brochure fundraising firm, the school is your agent."

A. That is correct.

. . . .

Q. Okay. And I think you just told me but—this [March 2008 letter] is the document that you would say instituted the—what we call the new rule, but it does away with the seller versus the agent for seller analysis. Right?

A. That is correct.

. . . .

Q. Well—okay. But if you look at the whole transaction, the fact of the matter is, since March 18th, 2008, you no longer look at any part of the transaction if you're a brochure fundraiser; isn't that correct?

A. That's correct. We're going to say that they are subject to tax and that the vendor needs to collect the tax.

Less than a month later, on April 14, 2008, the Comptroller's office submitted a follow-up letter (the "April 2008 letter") to the Executive Director of the Texas PTA and counsel for Entertainment, stating:

> This office has consistently held that school fundraising firms taking orders through brochures and sales forms were considered the actual sellers of the fundraising items and responsible for the sales tax on the full sales price. The PTAs or other nonprofit

7

> associations act as representatives for the fundraising firms in taking the orders and earning a commission and are not responsible for the sales tax on these sales.
>
> . . . .
>
> To resolve these issues, for clarity, and the efficient administration of the tax, the Comptroller will regard the PTAs or other nonprofit entities as the sales agent for the fundraising firm and will apply § 151.024 of the Texas Tax Code.

The April 2008 letter was signed by the "Assistant Director of Tax Administration" of the Comptroller's office and referenced a meeting that had taken place that morning between officers of the Texas PTA and "the Comptroller and staff." In this appeal, the Comptroller does not contend that the signer of the letter was acting with anything less than her full authority.

Shortly thereafter, Entertainment filed suit seeking declaratory and injunctive relief against enforcement of the Comptroller's "New Rule." Specifically, Entertainment sought a declaration under the APA that the rule embodied in the March and April 2008 letters was invalid and a further declaration under the UDJA that the Comptroller exceeded her statutory authority under section 151.024 of the tax code in adopting the rule and applying section 151.024 to Entertainment. The Comptroller filed a plea to the jurisdiction, asserting that the trial court lacked subject-matter jurisdiction over Entertainment's claims. With respect to Entertainment's rule challenge, the Comptroller argued that the policy in question is not a "rule" that can be challenged under the APA; alternatively, the Comptroller asserted that even if the policy is a rule, the APA does not permit a challenge to rules that affect the assessment or collection of a tax. In addition, the Comptroller's plea urged that Entertainment's request for declaratory relief under the UDJA is barred by sovereign immunity because she was acting within her discretionary authority in applying section 151.024 of

8

the tax code to Entertainment. The Comptroller further asserted that because the tax code provides the exclusive remedy for taxpayers who wish to enjoin assessment, collection, or enforcement of a tax, the trial court also lacked jurisdiction over Entertainment's request for injunctive relief; additionally, the Comptroller argued that Entertainment's UDJA claim was not yet ripe.

After a hearing, the trial court denied the Comptroller's plea to the jurisdiction and granted Entertainment's application for a temporary injunction. The order denying the plea specified that the trial court had jurisdiction "over the declaratory judgment cause of action under Section 2001.038 of the APA in its entirety," finding that the Comptroller had adopted a new rule with respect to fundraising firms but had failed to comply with the procedural requirements to adopt a new administrative rule. In its order granting the temporary injunction, the trial court directed the Comptroller to "desist and refrain from implementing and enforcing the New Rule described by the Comptroller's letters dated March 18, 2008 and April 14, 2008 unless and until the Comptroller properly enacts the New Rule according to the procedural requirements of the APA" or until the Court renders its final judgment.

On appeal, the Comptroller argues that (1) the trial court lacked subject-matter jurisdiction under the APA; (2) Entertainment cannot establish subject-matter jurisdiction under the UDJA; (3) injunctive relief is barred by the tax code; and (4) injunctive relief is improper under general principles of equity.

**STANDARDS OF REVIEW**

Whether a court has subject-matter jurisdiction is a question of law. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

9

A plea to the jurisdiction often may be determined solely from the pleadings and sometimes must be. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554-55 (Tex. 2000). Such a determination is reviewed de novo. *Miranda*, 133 S.W.3d at 226. When a plea to the jurisdiction challenges the existence of jurisdictional facts, however, a court should consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *Id.*

Where the jurisdictional issue or facts do *not* implicate the merits of the case, and the facts are disputed, the court—not the jury—must make the necessary fact findings to resolve the jurisdictional issue. *See id.* ("'Whether a district court has subject matter jurisdiction is a question for the court, not a jury, to decide, even if the determination requires making factual findings, unless the jurisdictional issue is inextricably bound to the merits of the case.'") (quoting *Cameron v. Children's Hosp. Med. Ctr.*, 131 F.3d 1167, 1170 (6th Cir. 1997)). If, however, the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts. *Id.* at 228. Because a court should not proceed with a case over which it has no jurisdiction, it should make the jurisdictional determination as soon as practicable, but has discretion to defer the decision until the case has been more fully developed. *Id.* at 227.[3]

---

[3] Here, the trial court's order denying the plea to the jurisdiction did not indicate that the court was deferring its jurisdictional determination until the case was more fully developed. Nor did Entertainment urge a deferral of the issue in its response to the Comptroller's plea to the jurisdiction. Accordingly, because the trial court did not purport to exercise its discretion in this regard, we will not attempt to apply an abuse-of-discretion standard in reviewing the trial court's denial of the plea. In any event, as discussed below, the relevant facts before the trial court were undisputed and conclusive, so fuller development of the case would have served no purpose.

In an appeal from an order granting or denying a request for a temporary injunction, appellate review is confined to the validity of the order that grants or denies the injunctive relief. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A reviewing court must not substitute its judgment for that of the trial court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* A trial court abuses its discretion when it acts without reference to any guiding rules or principles, not when it simply exercises that discretion in a manner different from how a reviewing appellate court might. *Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007). As a reviewing court, we must view the evidence in the light most favorable to the trial court's order and indulge every reasonable inference in its favor. *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 105-06 (Tex. App.—Austin 2003, no pet.).

**DISCUSSION**

*Subject-Matter Jurisdiction*

In issues one and two, the Comptroller asserts that the trial court erred in denying her plea to the jurisdiction because the trial court lacked subject-matter jurisdiction over Entertainment's suit. The trial court's order denied the Comptroller's plea to the jurisdiction on the specific basis that it had jurisdiction over Entertainment's "cause of action for declaratory judgment under Section 2001.038 of the Texas Government Code, Administrative Procedures Act." The APA allows a person to challenge the validity or applicability of an agency rule pursuant to a declaratory judgment action if it is alleged that the rule or its threatened application interferes with or impairs a legal right

11

or privilege of the plaintiff. APA § 2001.038(a). As this Court has consistently held, the APA declaratory-judgment vehicle of section 2001.038 is a legislative grant of subject-matter jurisdiction. *See, e.g.*, *Keeter v. Texas Dep't of Agric.*, 844 S.W.2d 901, 902 (Tex. App.—Austin 1992, writ denied); *Lopez v. Public Util. Comm'n*, 816 S.W.2d 776, 782 (Tex. App.—Austin 1991, writ denied); *Rutherford Oil Corp. v. General Land Office*, 776 S.W.2d 232, 235 (Tex. App.—Austin 1989), *aff'd sub nom. State v. Flag-Redfern Oil Co.*, 852 S.W.2d 480 (Tex. 1993).

In the present case, the parties submitted evidence relevant to the jurisdictional issue, but that evidence does not implicate the merits of Entertainment's case: the jurisdictional inquiry concerns whether the Comptroller's March and April 2008 letters constitute a rule under the APA and, if so, whether that rule or its threatened application interferes with or impairs Entertainment's legal rights or privileges, whereas the merits concern whether the rule was validly adopted. The relevant jurisdictional facts were undisputed; accordingly, we review the trial court's decision de novo.

The Comptroller contends that the statements contained in the March and April 2008 letters do not constitute a "rule" that can be challenged under the APA. Rather, the Comptroller argues that these statements are merely advisory opinions, not binding instructions, concerning her future use of section 151.024 of the tax code in the enforcement of sales tax. We disagree.

The APA defines "rule" as follows:

"Rule":

    (A) means a state agency statement of general applicability that:

        (i) implements, interprets, or prescribes law or policy; or

12

                    (ii) describes the procedure or practice requirements of a state agency;

          (B)  includes the amendment or repeal of a prior rule; and

          (C)  does not include a statement regarding only the internal management or
          organization of a state agency and not affecting private rights or procedures.

APA § 2001.003(6).  There is no question in this case that the March and April 2008 letters are

statements implementing, interpretating, or prescribing law or policy.  As the Comptroller's witness

testified, these letters communicated the Comptroller's intention to apply section 151.024 in all cases

involving brochure fundraising firms, thereby interpreting the tax code to mean that such firms are,

for purposes of collecting and remitting sales tax, always the "sellers" of the taxable items.

          As the Comptroller correctly points out, however, "[n]ot every statement by an

administrative agency is a rule for which the APA prescribes procedures for adoption . . . ." *Brinkley*

*v. Texas Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.) (quoting *Texas*

*Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994)).  In order to constitute a rule, the

statements must be generally applicable and may not pertain only to the internal management of the

agency without affecting private rights or procedures.

          "The term 'general applicability' under the APA references 'statements that affect the

interest of the public at large such that they cannot be given the effect of law without public input.'"

*El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008)

(quoting *Railroad Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003)).  "The definition

does not reference statements made in determining individual rights, even if the number of

13

individuals is large and they can be described as falling within a defined class." *WBD Oil*, 104 S.W.3d at 79.[4]

We conclude that the Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are "generally applicable" statements for purposes of the APA. These interpretations apply not only to Entertainment and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in business across the state.[5]

---

[4] The supreme court's analysis in *WBD Oil*, overruling this Court's decision that the Railroad Commission's field rules were "rules" under the APA, *see WBD Oil & Gas Co. v. Railroad Comm'n*, 35 S.W.3d 34 (Tex. App—Austin 1999), *rev'd*, 104 S.W.3d 69 (Tex. 2003), turns on the fact that the field rules had been promulgated through trial-type proceedings rather than through the APA's rulemaking provisions. 104 S.W.3d at 79. Thus, the court's comments regarding "statements made in the determination of individual rights" must be read in light of its holding that the field rules in question had been adopted in a contested case that adjudicated the individual rights of the parties and could not, therefore, be challenged as generally applicable "rules" in a declaratory-judgment action under section 2001.038. *See id.*

[5] The Comptroller's representative confirmed that the rule would be uniformly applicable during his testimony on cross-examination:

Q.     And does this new—does Exhibit No. 8 [the March and April 2008 letters]—is it in your mind—does this apply to all brochure fundraising firms who operate in Texas?

A.     Yes, under this model.

Q.     What model is that?

A.     Well, the model with the taking of the sales orders and with the brochures and—if that's what you're talking about when you say brochure fundraising firms.

Q.     It is.

14

*Compare Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.*, 997 S.W.2d 651, 660 (Tex. App.—Austin 1999, pet. dism'd w.o.j.) (holding that statements contained in agency memoranda were rules because they imposed binding instructions affecting private rights of all similarly situated persons), *with Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 269 (Tex. App.—Austin 2002, no pet.) (declining to view agency correspondence as stating rule when policy was directed only at plaintiff and did not implicate rights of any party other than plaintiff).

Moreover, construing the statements in the March and April 2008 letters as "rules" is consistent with the supreme court's instruction that we consider the intent of the agency, the prescriptive nature of the guidelines, and the context in which the agency statement was made. *See Leeper*, 893 S.W.2d at 443 (holding that statements evincing intent to urge action by legislature did not constitute rule under APA and noting that guidelines "were only recommended, not prescriptive"). In this case, the March and April 2008 letters informed interested parties of the Comptroller's intention to regard all school groups as agents of the fundraising firms and the firms themselves as the sellers for purposes of applying the sales-tax provisions of the tax code. The statements in the letters are also prescriptive, unambiguously expressing an intent to apply this interpretation of section 151.024 in all future cases involving brochure-fundraising firms, regardless of whether the particular circumstances of each transaction might have resulted in different tax treatment under the "seller versus agent-for-seller" analysis the Comptroller had previously applied.

The statements in the March and April 2008 letters are also consistent with subsection (c) of the APA's definition of "rule": while the interpretation would bind agency employees to apply

15

the rule in analyzing the tax responsibilities of parties to these sales, it is not directed "only" to "the internal management or organization of a state agency." *See* APA § 2001.003(6)(c). Rather, it is aimed at placing the regulated public on notice of the Comptroller's prospective, blanket application of section 151.024 of the tax code.

Finally, we decline to adopt the Comptroller's position that a declaratory-judgment action can never be available to challenge a Comptroller rule. As support for her position, the Comptroller cites this Court's decision in *First State Bank v. Sharp*, 863 S.W.2d 81 (Tex. App.—Austin 1993, no writ). But the primary holding of *First State Bank* was rejected by the supreme court in *R Communications v. Sharp*, 875 S.W.2d 314, 318 (Tex. 1994) (reversing court of appeals opinion relied on by *First State Bank* court and declaring unconstitutional section 112.108 of tax code "insofar as it would preclude a taxpayer from obtaining judicial review of its tax liability by means of a declaratory action"). Whether *First State Bank* is still good law for some purposes is an issue we need not decide, as the current version of section 112.108 does not bar Entertainment's suit under the *R Communications* decision. Section 112.108 purports to prevent a court from issuing a declaratory judgment regarding the "applicability, assessment, collection, or constitutionality of a tax or fee . . . or the amount of the tax or fee due." Tax Code § 112.108. The legislature did not intend section 112.108 to bar all declaratory actions involving the assessment and collection of taxes, as the next sentences read: "The court may grant such relief as may be reasonably required by the circumstances. *A grant of declaratory relief against the state* or a state agency shall not entitle the winning party to recover attorney's fees." *Id.* (emphasis added). Entertainment did not seek declaratory relief regarding the tax itself, but regarding the *validity of the rule* promulgated by the

16

Comptroller in violation of the APA, for which the legislature has expressly permitted suit by a declaratory-judgment action. *See* APA § 2001.038.

In light of the preceding, we hold that the Comptroller's statements in the March and April 2008 letters that she would henceforth regard a school group or other nonprofit entity doing business with a brochure-fundraising firm as the sales agent for the fundraising firm and apply section 151.024 of the tax code constitute a "rule" under the APA. Therefore, we conclude the trial court correctly determined that section 2001.038 conferred subject-matter jurisdiction over Entertainment's claim and properly denied the Comptroller's plea to the jurisdiction on this basis.[6] We overrule the Comptroller's first and second issues.[7]

---

[6] Professor Ron Beal has defined an "interpretive rule" as an agency statement made under the following conditions:

| (1) | it is issued by an agency board, commissioner, executive director or other officer vested with the power to act on behalf of the agency; |
| --- | --- |
| (2) | it is issued with the intent of the agency to notify persons or entities that are similarly situated or within a class described in general terms; |
| (3) | it is issued to notify those persons or entities of the agency's interpretation of a statutory provision that has been crystallized following reflective examination in the course of the agency's interpretive process; and |
| (4) | such interpretation was not labeled as tentative or otherwise qualified by arrangement for consideration at a later date. |

Ron Beal, *A Miry Bog Part II: UDJA and APA Declaratory Judgment Actions and Agency Statements Made Outside a Contested Case Hearing Regarding the Meaning of the Law*, 59 Baylor L. Rev. 267, 270 (2007); *see also* Ron Beal, *The APA and Rulemaking: Lack of Uniformity Within a Uniform System*, 56 Baylor L. Rev. 1, 29-46 (2004).

Although we need not place the label "interpretive rule" on the Comptroller's March and April 2008 letters, we note that they satisfy all the elements of Professor Beal's four-part test.

[7] On appeal, the Comptroller reurges each of the jurisdictional arguments raised in her plea to the jurisdiction regarding the declaratory relief sought by Entertainment, including several challenges regarding whether the trial court had jurisdiction under the UDJA; because we conclude

When an agency promulgates a rule without complying with the statutory rule-making procedures, the rule is invalid. *See* APA § 2001.035(a); *El Paso Hosp. Dist.*, 247 S.W.3d at 715. It is undisputed in this case that the Comptroller did not comply with the APA's procedural requirements for promulgating agency rules before issuing the March and April 2008 letters; accordingly, the rule announced by those letters is invalid. A court, on finding an agency rule invalid, may remand the rule to the agency to allow "reasonable time for the agency to either revise or readopt the rule through the established procedures." APA § 2001.040; *El Paso Hosp. Dist.*, 247 S.W.3d at 715. We will therefore affirm the trial court's order denying the Comptroller's plea to the jurisdiction and abating consideration of the substantive matters raised in Entertainment's petition "pending the Comptroller's determination as to whether she will seek to properly enact the administrative rule under the APA, and what the terms of that administrative rule would be."[8]

### *Temporary Injunction*

In issues three and four, the Comptroller argues that injunctive relief is barred by the tax code and contrary to general principles of equity. The Comptroller maintains that Entertainment was required to comply with the statutory requirements for pursuing a tax injunction, as stated in section 112.101 of the tax code. *See* Tax Code § 112.101. We disagree.

---

that the trial court had jurisdiction under the APA, however, we need not address the additional grounds. *See* Tex. R. App. P. 47.1.

[8] Our holding does not prevent the Comptroller from making an individualized determination, on a case-by-case basis, that a tax-exempt organization should be regarded as a fundraising firm's agent, after having determined that it is "necessary for the efficient administration" of chapter 151 of the tax code to do so. *See* Tax Code § 151.024.

18

The Comptroller's arguments misunderstand the nature of the injunctive relief granted by the trial court. Entertainment did not seek, and the trial court did not grant, a "tax injunction." By its order, the trial court enjoined the Comptroller "from implementing and enforcing the New Rule described by the Comptroller's letters dated March 18, 2008 and April 14, 2008 unless and until the Comptroller properly enacts the New Rule" in compliance with APA procedures. This situation is analogous to that presented by *Texas Alcoholic Beverage Commission v. Macha*, 780 S.W.2d 939 (Tex. App.—Amarillo 1989, writ denied), in which the taxpayer claimed that the Commission's suspension of his liquor permits for failure to remit taxes allegedly due violated his right to due process. After the trial court enjoined the suspension, the Commission argued on appeal that the injunction was improper because the taxpayer failed to prepay the taxes allegedly due or post a bond as required by section 112.101. *Id.* at 941. Affirming the order granting the injunction, the court of appeals held that, since the trial court's order "does not prohibit the collection of a state tax, license, registration or filing fee, section 112.101 does not control." *Id.* Similarly, here Entertainment has not sought to prohibit the assessment or collection of a tax or fee. Indeed, no tax had yet been assessed that the trial court could have enjoined.

The purpose of a temporary injunction is to preserve the status quo of the subject matter of a suit pending final disposition of the case on its merits. *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). Because of this limited purpose, the trial court has broad discretion to determine whether to issue a temporary injunction. *Amusement & Music Operators*, 997 S.W.2d at 654. In this case, the trial court found that Entertainment had presented evidence that, if its application was not granted, it would likely suffer "imminent and irreparable injury" because

implementation of the "New Rule" would disrupt its business and subject it to financial liability. The trial court further found that the threat of immediate and irreparable injury to Entertainment substantially outweighed the harm, if any, that the Comptroller would suffer as a result of having to reassess its administrative rule and adopt a rule that complied with the procedural requirements of the APA. Based on the record before us, we conclude that the trial court did not abuse its discretion. We overrule the Comptroller's third and fourth issues.

## CONCLUSION

Having overruled the Comptroller's issues on appeal, we affirm the orders of the trial court denying the Comptroller's plea to the jurisdiction and granting a temporary injunction in favor of Entertainment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson
    Concurring Opinion by Justice Henson

Affirmed

Filed:   June 12, 2009

20